**MARTHA M. HALL**
Attorney at Law
California State Bar No. 138012
964 Fifth Avenue, Suite 214
San Diego, California  92101
Telephone:  (619) 544-1451
Facsimile: (619) 544-1473
E-mail: Martha_DiIorioHall@yahoo.com

Attorney for Defendant **Gallegos-Aparicio**

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### (HON. GONZALO P. CURIEL)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>**MARCOS<br>　　GALLEGOS-APARICIO,**<br><br>　　　　Defendant. | Criminal No. **19-CR-02637-GPC**<br><br>Date: January 31, 2019<br>Time: 10:30 A.M.<br><br>**STATEMENT OF FACTS AND<br>MEMORANDUM OF POINTS<br>AND AUTHORITIES IN<br>SUPPORT OF DEFENDANT'S<br>MOTIONS** |

### I.

### STATEMENT OF FACTS

A.  The Procedure

On May 13, 2019, Marcos Gallegos-Aparicio was arrested near Campo, California.  He was charged with misdemeanor illegal entry, in violation of Title 8 U.S.C. §1325(a)(2), arraigned on those charges on May 14, 2019 and pleaded not guilty.  On May 21, 2019, Mr. Gallegos-Aparicio was released on a $5,000.00 person surety bond.  The case was assigned to Magistrate Burkhardt.

On July 12, 2019, the government filed an Indictment charging Mr. Gallegos-Aparicio with felony violation of Title 8 U.S.C. §1325(a)(1), specifically alleging that Mr. Gallegos-Aparicio had "previously committed the offense of illegal entry, as evidenced by his conviction for violation of Title 8, United States Code, Section 1325".  (CM/ECF 18).  Mr. Gallegos-Aparicio was arraigned on the Indictment on

1   July 18 and the case assigned to this Court.

2   B.   The Prior Misdemeanor from the District of Arizona

3       A felony violation of Title 8 U.S.C. §1325 requires the government to prove

4   the defendant's prior commission of "such offense" beyond a reasonable doubt.  To

5   prove the prior commission, the government seeks to prove that Mr. Gallegos-

6   Aparicio was previously convicted of misdemeanor illegal entry on February 29,

7   2012 in the US District Court for the District of Arizona at Tucson.

8       At the time of Mr. Gallegos-Aparicio's conviction on February 29, 2012, the

9   District of Arizona was deep into "Operation Streamline."  This program set up a

10  separate court and a separate procedure for defendants charged with misdemeanor

11  illegal entry with the goal of "processing" up to 70 defendants *a day*.

12  C.   The Facts Underlying the Instant Charge

13      On May 13, 2019, Agent Brian Mauler was on duty near Campo, California.

14  He was notified of and responded to the activation of a seismic intrusion device near

15  Boulevard, California. Exhibit D.  He searched the area for a few minutes and

16  discovered "shoe prints heading northbound."  Mauler does not specify the number of

17  prints that he observed nor does it appear that he took any photographs of the

18  footprints.  He claims that he followed the footprints for approximately "20 minutes"

19  and then encountered four individuals in the bushes of the rural, back-country

20  approximately half a mile north of the border and 20 miles east of Tecate, California.

21  Mauler immediately detained all four individuals. Exhibit D.

22      Mauler claims that one of the four individuals he encountered was Marcos

23  Gallegos-Aparicio.  He also claims that he questioned "each of the four" upon

24  detaining them and that "each stated that they were citizens of Mexico.  Meza,

25  Gallegos, Morillon and Castanega also each admitted that they had illegally crossed

26  the border and that they did not have any immigration documents that would allow

27  them to be int eh United States legally."  Exhibit D.  Mauler then placed each under

28

formal arrest and transported them back to the station.

At the Border Patrol Station Mr. Gallegos-Aparicio was advised of his consular rights and "elected to exercise his rights".  Exhibit D. Agent Moedano-Villar claims that the consular office was called but "no one was available to answer the call at that time."  Despite the invocation of the consular rights and despite the lack of any additional *Miranda* advice, Robbins proceeded to questions Mr. Gallegos-Aparicio about his citizenship, immigration documents and whether he had a fear of torture of persecution if returned to Mexico.  After this interrogation, Mr. Gallegos-Aparicio was advised of his *Miranda* rights by Agents Moedano-Villar and Ledesma.  Mr. Gallegos-Aparicio invoked his right to remain silent and requested a lawyer.  Exhibit D.

## II.

## MOTION TO DISMISS INDICTMENT

The Indictment in this case should be dismissed because Mr. Gallegos-Aparicio's underlying predicate misdemeanor conviction for a violation of Title 8 U.S.C. §1325 violated Due Process, *Padilla* and Fed.R.Crim.P. 11 to such an extent that the conviction cannot prove an element of a felony criminal offense – especially an element which enhances the offense from a simple misdemeanor to a felony.

A.  The Facts Surrounding the 2012 Misdemeanor Prior in Arizona

"Operation Streamline" was implemented in 2005 in the districts in Arizona.  It "began as a set of immigration enforcement policies created by the DOJ and DHS mandating the mass criminal prosecution of individuals crossing the U.S.-Mexico border without inspection. . . .To facilitate the mass prosecution of migrants, defendants are held in inhumane conditions in Border Patrol jails before being brought to federal criminal court, where magistrate judges complete all court proceedings – from arraignment to sentencing – in a single hearing."  Exhibit E, p. 12.  The District of Arizona established a separate "Streamline" Court with a goal of

speedily convicting defendants of the misdemeanor offense of illegal entry.  This "court" processes from 50-70 defendants a day.  Exhibit A.  In one day, the defendants meet with an appointed counsel, plead guilty and are sentenced.  In fact, one large courtroom serves as the "conference room" for the morning meetings between attorneys and their clients and then is used as the "courtroom" where they plead guilty and are sentenced in a mass hearing in the afternoon.  Exhibit A.  Each attorney is appointed to 4 -5 defendants, meaning that each defendant has less than an hour with his or her attorney to discuss the crime, review the discovery, review the plea offer, discuss sentencing and collateral consequences and get personal background information from the defendant.  Moreover, the large room is guarded by US Marshals and Border patrol agents meaning the attorney consultation is not private.  Exhibit A.

When Mr. Gallegos-Aparicio met with his attorney on February 29, 2012, he (as all the Streamline defendants) was shackled in five-point restraints – at the waist, ankles and in handcuffs.  Given only 3 hours in which to consult with 5 clients, Mr. Anderson had no more than 36 minutes to confer with Mr. Gallegos-Aparicio about the crime, review the discovery, discuss the plea offer, discuss the sentencing recommendation, the consequences of his plea and any potential defenses.  Exhibit A.

Mr. Gallegos-Aparicio, like all defendants who proceed through Operation Streamline, had been subjected to detention conditions that "lead to serious cognitive impairments, including attention problems, increased suggestibility, impaired memory, and slower mental processing speeds."  Exhibit E, 8.  "As their [CBP's] own handbook explains, there are '[n]o beds; a hold room is not designed for sleeping.'  Contrary to this design, however, CBP's data consistently shows that most individuals [defendants] spend at least one night in these facilities, with many detained for multiple nights."  Exhibit F, p. 13.  "CBP operates these facilities in such a way that detained individuals are deprived of sleep, are given inadequate amounts

of food and water, are extremely cold, unable to bathe and, in some cases, are deprived of necessary medical treatment." Exhibit F, p. 16. "One federal court has already found that the conditions in Border Patrol facilities in Arizona are likely unconstitutional. *See Doe v. Johnson*, No. 4:15-cv-00250-TUC-DCB, 2016 WL 8188563, at *15 (D. Ariz. Nov. 18, 2016), *clarified on denial of reconsideration*, 2017 WL 467238 (D. Ariz. Jan. 3, 2017), *aff'd sub nom., Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017). Exhibit F, pp. 16-17

Three federal court cases "confirm a troubling pattern of inhumane conditions of detention for those detained in these facilities." Exhibit. F, p. 17. In *Doe v. Johnson,* No. 4:15-cv-00250-TUC-DCB (D. Ariz. June 8, 2015), the district court granted plaintiff's motion for preliminary injunction, finding that the plaintiffs had "presented persuasive evidence that the basic human needs of detainees are not being met...." *Doe*, 2016 WL 8188563, at *3, 16; Exhibit F, pp. 17-21 (outlining the multiple ways the conditions are inhumane and dangerous). "With regard to sanitation, the [*Doe*] court relied upon the testimony of plaintiff's sanitation expert who "personally observed holding rooms with floors, walls, benches, drains, toilets, sinks, stalls and other fixtures ...which were badly soiled" and lacked waste receptacles for sanitary napkins, diapers and other bathroom waste. Exhibit F, pp 19-20. Similarly, in 2015, the District Court for the Central District of California held that "[i]n light of the voluminous evidence that Plaintiffs have presented of the egregious conditions of the [Border Patrol] holding cells, Defendants [CBP] have materially breached the [Flores] Agreement's term that Defendants provide 'safe and sanitary holding cells for class members while they are in temporary custody." *Flores v. Johnson*, 212 F. Supp. 3d 864, 882 (C.D. Cal. 2015), *clarified on denial of recons. sub nom., Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal 2015), *aff'd in part, rev'd in part and remanded,* 828 F.3d 898 (9th Cir. 2016); see also *Flores v. Sessions*, No. CV-85-4544DMG, 2017 WL 6060252, at *5-12 (C.D. Cal. June 27, 2017), *appeal*

*dismissed,* No. 18-55063, 2018 WL 3472723 (9th cir. Apr. 27, 2018).

Research conducted by a prominent forensic psychologist and the Ceres Policy research team determined that two separate coercive factors combine to prevent a knowing and voluntary plea in "streamline court".  "First, pre-hearing conditions, including confinements, lack of food, and sleep deprivations, 'have a clear and undeniable negative impact on the cognitive, emotional and physical capacities' of defendants."  Exhibit E, p. 14, citations omitted.  "Second, Streamline's *en masse* hearings and in-hearing procedures undermine a defendant's ability to understand and to navigate the high-stakes plea process."  Exhibit E, p. 14.  "While still suffering from the acute physical and mental effects of their detention, defendants are transferred for criminal prosecution directly to Streamline proceedings, where they are quickly processed *en masse* in abbreviated hearings.  The structure of these hearings disregards the continuing impact of defendant's experiences in pre-hearing detention, the unique aspects of each individual's case, and the fact that a majority of defendants report not understanding the constitutional rights they waive in entering a guilty plea or the real-life consequences that flow from it."  Exhibit E, pp. 8-9.

The problem is clear: with all the coercive elements surrounding Mr. Gallegos-Aparicio's 2012 guilty plea, i.e., the pre-plea conditions of confinement and the violations of Rule 11 and Due Process, the usual guarantees of a knowing and voluntary plea as well as a true and adequate factual basis do not exist here.  In fact, the factors indicate that the guilty plea is nothing more than a desperate attempt to "get out as soon as possible" from the Border Patrol detention facility and the courtroom in which he was held in five point shackles.  This coerced and untrustworthy guilty plea cannot establish the predicate "prior commission" beyond a reasonable doubt.

B.  The Law

When used to establish an element of a felony criminal offense, a prior

conviction must comply with Due Process and the law surrounding the taking of guilty pleas in federal court.  Here, the "Streamline" process was deficient in a number of ways that prohibit the use of Mr. Gallegos-Aparicio's 2012 conviction for illegal entry in the District of Arizona to prove an element of the charged felony. First, the judge failed to accurately state the elements of the crime of illegal entry in violation of Title 8 U.S. § 1325 by failing to state and explain that Mr. Gallegos-Aparicio had to enter "free from official restraint".  Second, the court completely failed to advise Mr. Gallegos-Aparicio, or inquire if his counsel advised that his removal following his plea was a "virtual certainty" in compliance with *Padilla v. Kentucky*, 559 U.S. 356 (2010) and would expose him to felony liability under Title 8 U.S.C. 1325 if arrested in the future for illegal entry. Third, taking 70 pleas *en masse* violates both Rule 11 and Due Process.

Nearly 80 years ago, the Supreme Court recognized that an unknowing and involuntary guilty plea is "wholly irreconcilable with the constitutional safeguards of due process." *Smith v. O'Grady*, 312 U.S. 329, 334 (1941).  Since then, courts have always held that judges must make a "constitutionally required determination" that a defendant's guilty plea is knowing and voluntary.  *McCarthy v. United States,* 394 U.S. 459, 465 (1969); see also *United States v. Dayton*, 604 F.2d 931, 939 (5th Cir. 1979) (en banc) (stating that a judge's determination of voluntariness "is of constitutional dimension").  And when a reviewing court cannot confirm that a plea was knowing and voluntary, it must hold that such plea was "obtained in violation of due process and is therefore void." *McCarthy*, 394 U.S. at 467.

Federal Rule of Criminal Procedure 11 was "designed to assist the district judge in making the constitutionally required determination that a defendant's guilty plea is truly voluntary." *Id.* at 465.  This Rule requires a judge to determine that a defendant entering a guilty plea understands a variety of rights, including the right to a trial; the right to be represented by counsel; the right to confront witnesses, testify

1    and present evidence; the nature of the charge; and the potential penalties.  Fed. R.

2    Crim. P. 11(b)(a)(A)-(O).  Additionally, the judge must "address the defendant

3    personally in open court" and "determine that the plea is voluntary."  Fed. R. Crim. P.

4    11(b)(2).  Importantly, the "mere ritual" of reciting the advisals in Rule 11(b)(1) will

5    satisfy neither the voluntariness determination of 11(b)(2) nor the requirements of due

6    process.  *United States v. Dayton*, 604 F.2d 931, 943 (5th Cir. 1979) (en banc).  If

7    questions arise as to whether a defendant's plea is knowing and voluntary a judge

8    must go beyond the ritual Rule 11 script in order to determine whether the plea is

9    knowing and voluntary.  *See, United States v. Carter*, 795 F.3d 947, 951 (9th Cir.

10   2015) and *United States v. Torres*, F. App'x 541, 542 (9th Cir. 2017); see also, *United

11   States v. Parra-Ibanez*, 936 F.2d 588, 595 (1st Cir. 1991); *Untied States v. Rossillo*,

12   853 F.2d 1062, 1067 (2d Cir. 1988); *United States v. Cole*, 813 F.2d 43, 46 (3d Cir.

13   1987); and *United States v. Damon*, 191 F.3d 561, 565 (4th Cir. 1999). Indeed, the

14   ritual can lull the courts into a false sense of compliance, avoiding the searching

15   inquiry that is often required.  *Dayton*, at 938.

16        1.  *The Plea And Conviction Is Invalid Due to the Court's Erroneous*

17            *Statement of the Elements, Omitting the Element of Being Free From*

18            *Official Restraint.*

19        An alien has not entered the United States for purposes of the crime of illegal

20   entry "until he or she is physically present in the country and free from official

21   restraint." *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1191 n.3 (9th Cir.

22   2000) (citing *United States v. Pacheco-Medina*, 212 F.3d 1162, 1166 (9th Cir. 2000)).

23   An individual is under official restraint if, after crossing the border, he is "'deprived

24   of his liberty and prevented from going at large within the United States.'" *United

25   States v. Cruz-Escoto*, 476 F.3d 1081, 1185 (9th Cir. 2007) (citations omitted). An

26   alien need not be in physical custody to be officially restrained. Id. (citing *United

27   States v. Ruiz-Lopez*, 234 F.3d 445, 448 (9th Cir. 2000)). "'[R]estraint may take the

28

form of surveillance, unbeknownst to the alien.'" *Id*. (quoting *Pacheco-Medina*, 212 F.3d at 1164). The government has the burden of proving the defendant was free from official restraint. *United States v. Castellanos-Garcia*, 270 F.3d 773, 777 (9th Cir. 2001).

In Mr. Gallegos-Aparicio's 2012 misdemeanor plea colloquy, the court omitted the necessary element that Mr. Gallegos-Aparicio's entry be "free from official restraint". The court's advice of the elements is as follows:

> THE COURT: . . . Count Two charges the petty offense of Illegal Entry. The elements of the offense are that you're a citizen of a country other than the United States, you entered the United States from Mexico, and you crossed the border away from a port of entry to you wouldn't be inspected by Immigration officials. Do all seven of you understand the charge against you in Count Two?
> THE INTERPRETER: "Yes" by all.

Exhibit B, p. 5. Nor does the "factual basis," written by the government in full legalese, enlighten us on the actual facts of Mr. Gallegos-Aparicio's arrest in 2012. The factual basis for the plea is as follows:

> I, Marcos GALLEGOS-Aparicio, am a citizen of Mexico. On or about February 27, 2012, at or near Sells, Arizona, in the District of Arizona, I, Marcos GALLEGOS-Aparicio, was found in the United States. I admit that prior to my re-entry, I was lawfully denied admission, excluded, deported and removed from the Untied Sates through Nogales, Arizona on April 04, 2001. I did not obtain the express consent of the Attorney General or the Secretary of the Department of Homeland Security to re-apply for admission to the United States prior to my illegal presence in the United States. Furthermore, as evidenced by my illegal presence in the United States, I admit that I entered the the [sic] United States of America from the United States of Mexico, at a time and place other than as designated by Immigration Officers of the United States of America.

Exhibit C, Plea Agreement, p. 4. The "factual basis" does not specify where or how Mr. Gallegos-Aparicio crossed, e.g. over the fence, through an unfenced area in the hills, through a canal or river. The "factual basis" does not specify how Mr. Gallegos-Aparicio was detected by law enforcement nor at one point in his alleged illegal crossing he was first seen. If, as is often the case, Mr. Gallegos-Aparicio was seen through a scope or by an agent *as he was crossing the border*, he did not enter free from official restraint. The factual basis does state that the area where Mr.

Gallegos-Aparicio was arrested was near Sells, Arizona.  Sells, Arizona is a small town just a few miles north of the International Border.

A failure to accurately state the elements of the offense and to obtain a factual basis that includes facts to support each element results in an invalid and unconstitutional conviction.  *Bousley v. United States*, 523 U.S. 614, 618-19 (1998); *Henderson v. Morgan*, 426 U.S. 637, 645-47 (1976); *United States v. Minore*, 292 F.3d 1109 (9th Cir. 2002).  A conviction obtained in violation of Due Process and the constitution cannot establish a critical element of an offense, especially when the unconstitutional conviction elevates the crime from a misdemeanor to a felony and increases the statutory maximum.  *Minore, supra*.

2.  *The District of Arizona's Streamline Court Violates Due Process*

Just as an underlying deportation must comport with Due Process, so too, a misdemeanor conviction which serves as a predicate that enhances an offense from a misdemeanor to a felony must comport with basic principles of Due Process.  *United States v. Mendoza-Lopez,* 481 U.S. 828, 837-838 (1987) ("[W]here a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding."); *see also United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1047-48 (9th Cir. 2004) (citing *United States v. Zarate-Martinez*, 133 F.3d 1194, 1197 (9th Cir. 1998)

*Mendoza-Lopez's* progeny have found numerous violations, including denial of counsel, failure to follow statutory procedures, and non-advisal of rights, which result in an unconstitutional deportation which cannot satisfy an element of a felony offense. *See United States v. Reyes-Bonilla*, 671 F.3d 1036, 1046 (9th Cir.) *cert. denied*, 133 S. Ct. 322 (2012) (failure to advise defendant of right to counsel in expedited removal constituted deprivation of due process); *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1084 (9th Cir. 2011) *cert. denied*, 132 S. Ct. 1983

(2012) (aliens are entitled to procedure enacted by Congress as a matter of due process); *United States v. Melendez-Castro*, 671 F.3d 950, 954 (9th Cir. 2012) (Fifth Amendment requires alien in immigration proceedings to be advised of possible relief). An order of removal is fundamentally unfair if 1) a defendant's due process rights were violated by defects in his underlying deportation proceeding, and 2) he suffered prejudice as a result of the defects. *Ubaldo-Figueroa*, 364 F.3d at 1048. Due process requires that those faced with removal or deportation be provided the right to a full and fair hearing. See *Getachew v. INS*, 25 F.3d 841, 845 (9th Cir. 1994) ("It is well-established that the due process clause applies to protect immigrants in deportation proceedings, and furthermore that due process for an immigrant threatened with deportation includes the right to a full and fair hearing."). A criminal proceeding should require nothing less and a failure to provide the full panoply of rights and advisements results in an unconstitutional conviction which cannot serve as a predicate for a later felony charge.

As noted above in the factual recitation, the pre-plea conditions of confinement for defendants prosecuted in the "streamline" court practically guarantee unknowing and involuntary pleas. The defendants are kept at the Border Patrol stations which were not built for housing people overnight and certainly not at the capacity they are currently used. Defendants cannot sleep due to the 24-hour harsh lights, the frigid temperatures, the lack of beds and blankets, insufficient food, inadequate sanitary conditions which undoubtedly result in unpleasant odors and inadequate medical treatment. Defendants in streamline court are emotionally labile and vulnerable, unable to focus and make difficult decisions, much less understand the proceeding.

To compound these problems, the procedures utilized in "court" proceeding violate Due Process. First the sheer number of defendants being "processed" in one day turns what is supposed to be an individualized hearing into a mass plea. The "Streamline" Court convicts 50 - 70 defendants ***each day***. Exhibit A. While the court

appoints defense attorneys to the defendants, each attorney has 4 -5 cases.  The
attorney "consults" with the defendants in the morning from 9:00 am to 12:00 pm
(noon) – a total of three hours for up to five defendants.  On the day that Mr.
Gallegos-Aparicio was "processed" and convicted, his attorney had been appointed
five (5) clients and there were a total of 70 defendants who were interviewed, pleaded
guilty and were sentenced – all before 5:00 p.m.  Exhibit A and B.  When Mr.
Gallegos-Aparicio met with his attorney, he was shackled in five-point restraints – at
the waist, ankles and in handcuffs.  Also, given only 3 hours in which to consult with
5 clients, Mr. Gallegos-Aparicio would have had no more than 36 minutes to confer
with his attorney about the crime, review the discovery, discuss the plea offer, discuss
the sentencing recommendation and discuss the consequences of his plea and any
potential defenses.  In practice, the "Streamline" process only provides time to read
the plea offer to the defendant and "sign-up" the defendant for the deal.  Such
complicated legal issues as "official restraint," waiver of appeal or even proof beyond
a reasonable doubt cannot be explained in just over half an hour.  Indeed, it takes
more than half an hour to get a defendant's background information and history,
much less review all the discovery, the plea offer and discuss the consequences of the
plea.  In short, the "Streamline Court" violates Due Process and a conviction from
such a court cannot prove an element of a felony charge of illegal entry.

    3.  *The Taking of the Plea by the Streamline Court in the District Court*
    *of Arizona Violates Rule 11*

    The Ninth Circuit has twice held that the manner of taking pleas en masse as
part of "Operation Streamline" violates Federal Rule of Criminal Procedure 11 (b)(2).
*United States v. Escamilla-Rojas*, 640 F.3d 1055 (9th Cir. 2011) and *United States v.
Aguilar-Vera*, 698 F.3d 1196 (9th Cir. 2012).[1]  In both of these cases the Ninth Circuit

_____

[1]  In the case of *Aguilar-Vera*, the record was clear that Mr. Aguilar-Vera wanted to plead
guilty and insisted on pleading guilty despite any Rule 11 violations or objections from his

1    found that the long lapse of time between the en masse advisement of rights and the

2    taking of the plea created too great a risk of confusion and lack of attention resulting

3    in an unknowing plea.  The *Aguilar-Vera* Court cautions that Rule 11(b)(1) and (b)(2)

4    was meant to address and prevent the danger that "[i]gnorance, incomprehension,

5    coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of

6    unconstitutionality" in a conviction by guilty plea.  *Boykin v. Alabama*, 395 U.S. 238,

7    242-43 (1969).  As described above, the pre-plea conditions of detention for these

8    defendants as well as the "streamlined" process which results in severe time

9    restrictions on consultation with counsel – all while in five-point restraints under the

10   watchful eye of Border Patrol agents and U.S. Marshals –  create a coercive

11   environment in which ignorance and incomprehension flourish.  Thus, Mr. Gallegos-

12   Aparicio's 2012 guilty plea is invalid under Rule 11.

13           4.  *The Plea Is Invalid Because the Court Failed to Inform Mr. Gallegos-*

14               *Aparcio of the Virtual Certainty of His Deportation, in Compliance With*

15               *The Holding in Padilla, and that the Conviction Could Enhance any*

16               *Future Charge of Illegal Entry to a Felony.*

17           In *Padilla v. Kentucky*, 559 U.S. 356 (2010), the U.S. Supreme Court addressed

18   the importance of what are sometimes termed "collateral consequences".  In *Padilla*

19   the defendant was subjected to the collateral, yet severe, consequence of deportation

20   after 40 years of lawful residence in the United States.  *Id.* at 359.  The Court held

21   that it Padilla's attorney was ineffective in failing to inform and advise Mr. Padilla of

22   the virtual certainty of deportation following his felony drug conviction.  See also,

23   *United States v. Chan*, 792 F.3d 1151, 1155 (9th Cir. 2015).  Thus, it is as important to

24   advise a defendant of potential severe consequences, such as deportation or

25   enhancement to a felony for a subsequent arrest, as it is to advise the defendant of the

26   _____

27   counsel.  In fact, counsel represented Mr. Aguilar-Vera's desires during the appeal process.
     Thus, the Rule 11 error found by the Ninth Circuit was also found to be harmless.  There are

28   no such representations as to Mr. Gallegos-Aparicio's intent or desires in this record.

1   maximum possible sentence.  *Padilla*, at 368 ("'[p]reserving the client's right to

2   remain in the United States may be more important to the client than any potential jail

3   sentence.'" (quoting *INS v. St. Cyr*, 533 U.S. 2271, 3223 (2001) (quoting 3 bender,

4   Criminal Defense Techniques §§60A.01, 60A.02[2] (1999))).  For a migrant

5   defendant with extensive family, including a wife and children, in the United States,

6   understanding the immigration and future criminal consequences of a conviction is

7   critical.

8         The Arizona Magistrate-Judge never advised Mr. Gallegos-Aparicio of any

9   rights to relief in Immigration Court nor the immigration consequences of his guilty

10   plea.   Mr. Gallegos-Aparicio was not advised of the fact that the misdemeanor

11   conviction could be a predicate to enhance any future charges of illegal entry from a

12   misdemeanor to a felony.  Finally, due to the torturous conditions of detention and the

13   limited time to consult with an attorney (in the presence of the Border Patrol Agents),

14   any attempt to explain these complicated legal consequences in the morning would

15   have been futile.

16   C.  Conclusion

17         The problems surrounding Operation Streamline, beginning with the onerous

18   conditions of detention, to the limitations on consultation with counsel, to the plea

19   colloquy which violates Rule 11 and Due Process, to the failure to accurately state the

20   elements of the offense and advise the defendants of critical consequences of their

21   pleas, render the plea unconstitutional (in violation of Due Process) and void.  This

22   plea cannot prove a critical element of felony charge.

23                                      **III**

24         **DEFENDANT'S POST ARREST STATEMENTS SHOULD BE**

25         **SUPPRESSED**

26         When Mr. Gallegos-Aparicio was advised of his rights per *Miranda*, he

27   invoked those rights requesting an attorney and declining to answer questions.  This

28

1   Court should suppress Mr. Gallegos-Aparicio statements made both in the field and

2   back at the Border Patrol Station which were taken prior to Mr. Gallegos-Aparicio

3   receiving his *Miranda* rights.

4           To give meaning to the Fifth Amendment right against self-incrimination, an

5   "accused must be adequately and effectively apprised of his rights and the exercise of

6   those rights must be fully honored." *United States v. Galindo-Gallegos*, 244 F.3d 728,

7   730 (9th Cir.), as amended, 255 F.3d 1154 (9th Cir. 2001). The prosecution may not

8   use statements, whether exculpatory or inculpatory, stemming from a custodial

9   interrogation of the defendant unless it demonstrates the use of procedural safeguards

10  effective to secure the right against self-incrimination. *Miranda*, 384 U.S. at 444;

11  *Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Missouri v. Seibert*, 542 U.S.

12  600, 608 (2004) (plurality).

13          When determining if an individual is in custody the ultimate inquiry is

14  "whether there [was] a 'formal arrest or restraint on freedom of movement' of the

15  degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322

16  (1994) (quoting *California v. Beheler*, 463 U.S. 1121 1125 (1983)).  However,

17  whether a defendant is "in custody" often comes down to a question of whether the

18  defendant was arrested or only subjected to a brief *Terry* stop.  In the case relied upon

19  by the government, *United States v. Galindo-Gallegos*, 244 F.3d 728, 732 (9th Cir.

20  2001), the Ninth Circuit held that the abbreviated stops and questioning at the border

21  are "ordinarily [] *Terry* stop[s], not custodial questioning."  Here too, there is "no

22  bright line rule for determining when an investigatory stop crosses the line and

23  becomes an arrest." *United States v. Parr,* 843 F.2d 1228, 1231 (9th Cir.1988)

24  (quoting *United States v. Hatfield,* 815 F.2d 1068, 1070 (6th Cir.1987)).  Thus,

25  "whether the police action constitutes a *Terry* stop or an arrest" requires evaluation of

26  "not only how intrusive the stop was, but also whether the methods used were

27  reasonable *given the specific circumstances." Washington v. Lambert,*98 F.3d 1181,

28

1186 (9ᵗʰ Cir. 1996); citing *Del Vizo*, 918 F.2d at 824–25.

As to whether law enforcement questions or statements rise to the level of interrogation requiring *Miranda* warnings, that issue is decided based on whether the questioning officer "should know [the questions] are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). *Miranda* requires "effective and express explanation" of the recited rights. 384 U.S. at 444–45. If this does not occur, statements must be suppressed. Id. The burden thus rests with the government to demonstrate by a preponderance of the evidence that any alleged waiver was voluntary, knowing, and intelligent. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). The Court must indulge every reasonable presumption against waiver of fundamental constitutional rights. *United States v. Heldt*, 745 F. 2d 1275, 1277 (9th Cir. 1984) (citations omitted).

Here, any questions the agents asked Mr. Gallegos-Aparicio before giving a *Miranda* advisal must be suppressed. Any questions related to Mr. Gallegos-Aparicio's alienage was likely to produce an incriminating response, as were any questions related to entry. Thus, any statements given in response to these types of questions—including so-called field statements and so-called booking questions—must be suppressed because Mr. Gallegos-Aparicio was not given Miranda warnings prior to questioning. *United States v. Gonzalez-Sandoval*, 894 F.2d 1043 (9ᵗʰ Cir. 1990) (standard "booking" questions regarding residence and place of birth constitute "interrogation" which must be preceded by *Miranda* warnings for defendant suspected of illegal entry); *United States v. Williams*, 842 F.3d 1143 (9ᵗʰ Cir. 2016) ("booking" questions regarding gang affiliation constituted interrogation requiring *Miranda* warnings); and *United States v. Washington*, 462 F.3d 1124 (9ᵗʰ Cir. 2006). At a minimum, this Court should hold an evidentiary hearing to determine whether Mr. Gallegos-Aparicio was "in custody" when first

detained "in the field" prior to questioning.

**IV**

**THE GOVERNMENT AND THE COURT MUST DISCLOSE ANY AND ALL INFORMATION FROM THE FACEBOOK PAGES AND PERSONNEL FILE UNDER THE SIXTH AMENDMENT, FIFTH AMENDMENT AND *BRADY*.**

A.  Relevant Facts

On July 1, 2019, news outlet *ProPublica* revealed the existence of a secret Facebook group in which current and former Border Patrol agents "joked about the deaths of migrants, discussed throwing burritos at Latino members of Congress visiting a detention facility in Texas . . . and posted a vulgar illustration depicting Rep. Alexandria Ocasio-Cortez engaged in oral sex with a detained migrant." A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica, July 1, 2019. The "about" section of this secret Facebook group, called "I'm 10-15," described it as a forum where current and former employees of U.S. Customs and Border Patrol ("CBP") could post "funny, serious, or just work related" content to start discussions. Ryan Devereaux, *Border Patrol Agents Tried to Delete Racist and Obscene Facebook Posts. We Archived Them.*, The Intercept, July 5, 2019. At the time that *ProPublica* published its story, the "I'm 10-15" Facebook group consisted of approximately 9,500 members. *Id*. The group's "about" section emphasized, "This is where the Green Line starts, with us." *Id*.

Journalists linked the profiles posting some of the most degrading and violent content to profiles belonging to current Border Patrol agents, including Thomas Hendricks, a supervisor at the Calexico Inspection Station. *Id*. In addition to publishing several articles about the Facebook group, journalists also provided information and the names of many participating agents directly to officials at CBP. In the days that followed, the existence of a second secret Facebook group with similar content, called "The Real CBP Nation" was reported by *CNN*. Geneva Sands

17

& Nick *Valencia, 2nd Customs and Border Protection-connected secret Facebook group shows mocking images*, CNN, July 5, 2019.

In response to this media coverage, CBP announced that it launched an investigation into the "I'm 10-15" Facebook group, noting that CBP's Standards of Conduct state:

> Employees will not make abusive, derisive, profane, or harassing statements or gestures, or engage in any other conduct evidencing hatred or invidious prejudice to or about one person or group on account of race, color, religion, national origin, sex, sexual orientation, age or disability. This includes comments and posts made on private social media sites.

CBP Statement on Private Facebook Group Activity, July 1, 2019. Further, Border Patrol Chief Carla Provost, who was herself a member of the "I'm 10-15" Facebook group, stated that "any employees found to have violated our standards of conduct will be held accountable." *Id*. A spokesperson for CBP stated that several employees were placed on restricted duty as a result of posts in the "I'm 10-15" Facebook group and that the "majority of employees who have been positively identified" were instructed by letter to stop posting offensive material. A.C. Thompson, *Border Patrol Condemns Secret Facebook Group, but Reveals Few Specifics*, ProPublica, July 10, 2019.

It has also come to light that Border Patrol leadership has long been aware of the "I'm 10-15" Facebook group. In addition to CBP Chief Carla Provost's membership and participation in the group, CBP executive Mark Morgan was also made aware of the group as early as 2016. *Id*. Further, the "I'm 10-15" Facebook group was monitored by CBP's public affairs office prior to its existence being made public. *Id.* Matthew Klein, the assistant commissioner of CBP's Office of Professional Responsibility, acknowledged that his office had investigated posts from the "I'm 10-15" Facebook group as early as January 2018. Abigail Hauslohner, *CBP is investigating dozens of employees over alleged roles in Facebook group that ridiculed migrants,* The Washington Post, July 15, 2019.

18

1   B.  <u>Relevant Law</u>

2          Mr. Gallegos-Aparicio has a constitutional right to explore the agent's biases,

3   prejudices, any misguided motivation to persecute immigrants and persons of Latinx

4   heritage, and history of dishonesty and misconduct related to his job.  Mr. Gallegos-

5   Aparicio's right to explore these areas emanates from both the Sixth Amendment

6   right to confront and cross-examine his accuser and his Fifth Amendment right to due

7   process.  "[T]he exposure of a witness' motivation in testifying is a proper and

8   important function of the constitutionally protected right of cross-examination."

9   *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974); see also, *Silva v. Brown*, 416 F.3d 980,

10  985 (9th Cir. 2005) (holding,"We cannot overemphasize the importance of allowing a

11  full and fair cross-examination of government witnesses whose testimony is

12  important to the outcome of the case.") (quoting *Silva v. Woodford*, 279 F.3d 825,

13  855 (9th Cir. 2002) (quoting, *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir.

14  1993))).  In addition, a witness' bias against a class of which the defendant is a

15  member is a relevant subject that must be subject to cross-examination. *See, e.g.*,

16  *United States v. James*, 139 F.3d 709, 713 (9th Cir. 1998) (concluding that evidence

17  of a witnesses' racial bias is a relevant subject for cross-examination under Federal

18  Rule of Evidence 401); *United States v. Kartman*, 417 F.2d 893, 897 (9th Cir. 1969)

19  ("Prejudice toward a group of which defendant is a part may be a source of partiality

20  against the defendant. He is therefore entitled to a reasonable opportunity to cross-

21  examine witnesses as to the existence of any such prejudice, and its possible effect

22  upon their testimony."); *Gaines v. United States*, 994 A.2d 391, 401 (D.C. 2010)

23  ("[A] witness' racial animus or prejudice is a proper subject of bias cross-examination

24  as long as the questions posed are relevant to the witness' credibility."); *Brinson v.

25  Walker,* 547 F.3d 387, 392 (2d Cir. 2008) (finding that a defendant states a violation

26  of the Confrontation Clause by showing that he was prohibited from engaging in an

27  otherwise appropriate cross examination designed to show racial bias).

28

1         In *Brady*, the Supreme Court held that the government must disclose

2    information in its possession that is material and favorable to the defendant on the

3    issue or guilt or punishment. *Id.* "Favorable evidence" includes impeachment

4    evidence. *Banks v. Dretke*, 540 U.S. 668, 685, 700-02 (2004); *Giglio v. United*

5    *States*, 405 U.S. 150 (1972); see also, *United States v. Price*, 566 F.3d 900, 907 (9th

6    Cir. 2009) (reversing conviction for prosecution's failure to turn over evidence of

7    witness's prior arrests for theft offenses); *United States v. Blanco*, 392 F.3d 382, 387

8    (9th Cir. 2004) ("*Brady/Giglio* information includes 'material . . . that bears on the

9    credibility of a significant witness in the case.'"); *Carriger v. Stewart*, 132 F.3d 463,

10   480 (9th Cir. 1997) (en banc) (holding that impeachment evidence was material

11   where it pertained to "the prosecution's star witness"); *United States v. Brumel-*

12   *Alvarez*, 991 F.2d 1452 (9th Cir. 1993) (evidence that the informant lied during the

13   investigation or that he thwarted the opportunity to gather crucial evidence would be

14   relevant to his credibility and the jury was entitled to know of it); and, *United States*

15   *v. Shaffer*, 789 F.2d 682, 689 (9th Cir. 1986) (reversing conviction due to

16   government's failure to disclose full benefits accorded to key prosecution witness).

17   The "Constitution requires a fair trial, and one essential element of fairness is the

18   prosecution's obligation to turn over exculpatory evidence." *Milke v. Ryan*, 711 F.3d

19   998, 1002-02 (9th Cir. 2013) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963);

20   *United States v. Bagley,* 473 U.S. 667, 674-75 91985); and *Giglio v. United*

21   *States*,405 U.S. 150, 153-55 (1972)). Due process imposes an "inescapable" duty on

22   the prosecutor "to disclose known, favorable evidence rising to a material level of

23   importance." *Kyles v. Whitely,* 514 U.S. 419, 438 (1995). Moreover, "the state cannot

24   satisfy its *Brady* obligation to disclose exculpatory and impeachment evidence 'by

25   making some evidence available and asserting that the rest would be cumulative.

26   Rather the state is obligated to disclose "all material information *casting a shadow* on

27   a government witness's credibility."" *Benn v. Lambert*, 283 F.3d 1040, 1057-58 (9th

28

Cir. 2002) (emphasis added); see also, *Aguilar v. Woodford*, 725 F.3d 970, 982 (9th
Cir. 2013)(holding "[t]here is no doubt that [the narcotic detector dog] Reilly's
history of making erroneous scent identifications is exculpatory evidence.").

Material impeachment evidence isn't just discoverable; under *Giglio*, it must be
disclosed unilaterally as a matter of constitutional right.  *Milke*. 711 F.3d at 1006. The
prosecutor has an affirmative "duty to learn of any favorable evidence known to the
others acting on the government's behalf in the case, including the police." *Kyles v.
Whitley*, 514 U.S. 419, 437-38 (1995).  The prosecutor is also charged with
knowledge of any *Brady* material of which the prosecutor's office or the investigating
police agency is aware. *See Youngblood v. West Virginia,* 547 U.S. 867, 869–70
(2006) (per curiam). Agents' personnel files are within the possession and knowledge
of the government (with a capital "G") and the prosecutor therefore has an affirmative
duty to examine these files for material impeachment and disclose that evidence to the
defendant. *United States v. Kiszewski*, 877 F.2d 210, 216 (2nd Cir. 1989) (discussed
with approval by the Ninth Circuit in *Milke v. Ryan*, 711 F.3d at 1011).  In this case,
the government is acutely aware of the now infamous Facebook groups and has
initiated investigations of those groups, even forcing the "take down" of those pages.
Information about agents' participation in these groups and pages is therefore within
the prosecutor's and the investigating agency's possession within the meaning of
*Brady, Bagley and Kyles*.

When, as here, there is an indication that files within the government's control
contain *Brady* information, "the trial court must do more than take the government's
word that *Brady* material doesn't exist – the court must review the files in questions."
*Milke*, 711 F.3d at 1011 (citing *Kiszewski, supra*, 877 F.2d at 216).   Our circuit has
"long held that the government has a *Brady* obligation 'to produce any favorable
evidence in the personnel records' of an officer."  *Milke*, 711 F.3d at 1016 (citing
*United States v. Cadet,* 727 F.2d 1453, 1467 (9th Cir.1984)).  Our circuit has "also

held that "the government has a duty to examine personnel files upon a defendant's request for their production." *United States v. Henthorn,* 931 F.2d 29, 31 (9th Cir.1991).  That constitutional obligation is not satisfied by simply asking the agent if he has any negative information in his file.  The prosecutor must investigate to determine if there is *Brady* and *Giglio* information, produce that information to the defense or, at a minimum, submit the original information to the court for an in camera review.

If the prosecution isn't sure whether material in a personnel file rises to the *Brady* threshold, "it may submit the information to the trial court for an *in camera* inspection. *Cadet,* 727 F.2d at 1467–68 (internal quotation marks omitted) (quoting *United States v. Gardner,* 611 F.2d 770, 775 (9th Cir.1980)). As the Supreme Court held in *Kyles v. Whitley,* "a prosecutor anxious about tacking too close to the wind will [or should] disclose a favorable piece of evidence." 514 U.S. at 439.

*Milke v. Ryan* is a disturbing example of a prosecutor tacking too close to the wind.  711 F.3d 998. There, defendant *Milke* was arrested, charged, convicted of the murder of her six-year-old son and sentenced to death based on the testimony of Agent Armando Saldate.  Despite Milke's vigorous battle to acquire material impeachment information before the state trial and appellate courts, her efforts were stymied until she landed in federal court on habeas review.  Under order from a federal district judge, the state of Arizona finally coughed-up information from the agent's personnel file indicating a penchant for rogue behavior and prevarication (he was suspended after sexually assaulting a woman during a traffic stop and lying about his conduct).  During the habeas litigation, the defense team uncovered a series of court rulings finding this same agent had violated *Miranda*, the Fifth Amendment and the Fourth Amendment *repeatedly*.

The Ninth Circuit held the state had knowledge of both the information in Saldate's personnel file and the series of adverse court rulings.  *Milke*, at 1016.  The

court went on to conclude: "Even if there somehow weren't actual knowledge of Saldate's misconduct, inadvertent failure to disclose is enough for a *Brady* violation." *Id.* at 1017; see also *Strickler*, 527 U.S. at 282.  The Ninth Circuit then ordered "the state to provide **Mickle's counsel** with Saldate's police personnel records covering all of his years of service . . . ." *Id.* at 109.

The government is also required to disclose content from the Secret Facebook Groups pursuant to Federal Rule of Criminal Procedure 16(a). Rule 16(a) "grants criminal defendants a broad right to discovery." *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010). The Ninth Circuit has held that the government is in custody or control of materials in the possession of any agency involved in the investigation of the case. *See, e.g.*, *United States v. Santiago*, 46 F.3d 885, 893 (9th Cir. 1995) (finding that the United States Attorney's Office had knowledge of and access to files held by the Bureau of Prisons); *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989) (holding that Rule 16 requires disclosure of items in the possession of any federal agency participating in the investigation that the prosecutor has knowledge of and can access).

Although Rule 16(a) requires a defendant to establish the materiality of the requested item, the Ninth Circuit has stated that "[m]ateriality is a low threshold" that is "satisfied so long as the information would have helped [the defendant] prepare a defense." *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013) (internal quotations omitted).  If evidence is relevant under Federal Rule of Evidence 401, then it is clearly material under Rule 16.  *United States v. James*, 139 F.3d 709, 713 (9th Cir. 1998).

In *James*, the Ninth Circuit concluded that evidence of a testifying FBI agent's official reprimand for making a race-based joke was relevant under Rule 401. There, the government's witness had previously received a letter of reprimand when he colored the face of a toy scuba diver black and left it on the desk of an African-

American colleague who was taking scuba lessons. In reviewing the district court's decision to exclude the evidence, the Ninth Circuit stated that it was "more probable that one who had engaged in such an incident is racially biased than one who had not." *Id*. at 713. Similarly, it is more probable that a CBP agent who was a member or a participant in the secret CBP Facebook groups is racially biased than an agent who was not. Just as in *James* where the FBI agent participated in an a racist action that he had characterized as a "joke," the agents who post, comment, and like posts in the secret Facebook group are also engaging in racist discourse disguised as humor. *See id.* It has been well-documented that a core theme of the content posted and consumed by members of these Facebook groups were supposedly-humorous inflammatory posts about migrants and people of Hispanic descent. This is exactly the kind of conduct the Ninth Circuit in *James* found to be relevant to a witness' credibility at trial. *Id.* Under the Ninth Circuit's rationale in *James*, evidence of a government witnesses' participation in such a group is relevant impeachment evidence under Rule 401.

## VI.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court dismiss the Indictment, suppress all statements made by Mr. Gallegos-Aparicio, including field statements and "booking" statements, and order *Brady* and *Henthorn* discovery.

Respectfully submitted,

S/Martha M. Hall

Dated: January 27, 2019         **MARTHA M. HALL**
Attorney at Law
Attorney for **Gallegos-Aparicio**

24