ROBERT S. BREWER, JR.
United States Attorney
JILL S. STREJA
Assistant United States Attorney
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
(619) 546-8401
Jill.Streja@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 19-CR-2637-GPC |
|---|---|
| Plaintiff, | |
| v. | **THE UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT** |
| MARCOS GALLEGOS-APARICIO, | |
| Defendant. | |
| | Date:  November 12, 2020<br>Time:  2:30 p.m. |

Defendant has moved to dismiss this case on equal protection grounds. For the reasons discussed below, Defendant's motion should be denied.

### I.

### **DEFENDANT'S MOTION TO DISMISS IS UNTIMELY**

This case originated in May 2019; substantive motions were not filed until January 27, 2020. Those motions, including a motion to dismiss the indictment, were heard, considered, and denied in a decision issued on August 13, 2020. Now, two months later, Defendant has filed yet another motion to dismiss the indictment.

The argument rests on the decision in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), a case decided by the Supreme Court 43 years ago. It is not premised upon newly discovered facts, as it is a facial challenge to the statute. As such, it can hardly be said to be premised on new developments in the law. That is especially true given that, as noted by Judge Battaglia in *United States*

*v. Rivera*, 19-CR-5151-AJB, identical motions have been filed in this district for several months now. *See, e.g., United States v. Fernandez-Ferrer*, 19-CR-3668-KSC (motion filed July 21, 2020). These motions have been filed in § 1325 cases in this district since July – and have been routinely rejected. *See, e.g., United States v. Marin-Salido*, 19-MJ-24312-AGS (denying identical motion); *United States v. Morales-Robledo,* 19-MJ-24442-AHG (denying motion to dismiss 1325 charge based on same argument). As this motion is not based on any new law or facts, there is no reason it could not have been filed earlier than well over a year after the indictment was filed, and it should be dismissed as untimely.

## II.

## DEFENDANT'S MOTION TO DISMISS FAILS ON THE MERITS

With respect to his equal protection claim, Defendant is not charged with any law enacted in the 1920s; he is charged with attempted entry, a crime first enacted by Congress in 1990. This alone disposes of Defendant's motion and renders his claim non-justiciable. But even on the merits, the equal protection claim fails. Congress has plenary power over immigration affairs and its decisions are subject to a highly deferential standard of review. The illegal entry law easily passes that low standard.

### A.   Statutory Background

In the Immigration Act of 1917, Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. To enhance the deterrent value of this statute, the 70th Congress made unlawful entry a misdemeanor offense in 1929. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2.[1] As the House Committee Report stated, "it is believed that if the class of aliens who are endeavoring to enter the United States surreptitiously

---

[1] The text stated, "Any alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials, or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall be guilty of a misdemeanor."

2

1  become aware that when detected they will be fined and imprisoned, as well as deported,
2  the number who attempt to smuggle themselves or have themselves smuggled into the
3  United States will be materially lessened." H.R. Rep. No. 2418 at 7. This Act did not
4  include an attempted entry crime – the crime Defendant is charged with.

5        Over twenty years later, in 1952, the 82nd Congress passed the Immigration and
6  Nationality Act ("INA"), an act designed to "revise the laws relating to immigration,
7  naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163
8  (introduction). In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1 et
9  seq.), Congress included a misdemeanor and (for the first time) felony provision for illegal
10 entry. *Id.* at § 275, 66 Stat. 229 (8 U.S.C. § 1325).[2] Again, there was no provision for
11 attempted entry – the crime Defendant is charged with.

12       Nearly 40 years later, in the Immigration Act of 1990, the 101st Congress amended
13 8 U.S.C. § 1325 to add attempted entry for the first time to the list of crimes codified in
14 Section 1325. *See* Pub. L. No. 101-649, § 543(b)(2), 104 Stat. 5059. The Immigration Act
15 of 1990 was sponsored by Senator Edward Kennedy and easily passed by Congress.[3]

16     **B.**    <u>**Defendant Contests the Constitutionality of an Uncharged Crime**</u>

17       Defendant contends the illegal entry law is unconstitutional because of alleged racial
18 animus when illegal entry was first criminalized in the 1920s. For various reasons set forth
19 below, this claim fails. But there is a preliminary point which is fatal to Defendant's
20 motion. Defendant is not charged with any law enacted in the 1920s; Defendant is charged
21 with *attempted* entry under 8 U.S.C. § 1325(a)(1). *See* ECF No. 18. As indicated above,

---

[2] The text stated, "Any alien who (1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offenses, be guilty of a misdemeanor . . . and for a subsequent commission of any such offenses shall be guilty of a felony . . . ."

[3] *See, e.g.,* https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=101&session=2&vote=00323 (89 senators voted in favor); https://www.congress.gov/bill/101st-congress/senate-bill/358.

3

attempted entry first became a crime just 30 years ago, in the Immigration Act of 1990. Defendant offers no reason to believe that the attempted entry crime violates the constitution.[4] He does not even address the issue. This is dispositive of Defendant's motion.

### C. Defendant's Claim is Not Justiciable

The same fact also raises an insurmountable justiciability issue. Pursuant to Article III of the U.S. Constitution, federal courts can only adjudicate live cases or controversies. The court's "role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134 (9th Cir. 2000) (en banc). "Ripeness is an Article III doctrine designed to ensure that courts adjudicate live cases or controversies and do not issue advisory opinions [or] declare rights in hypothetical cases." *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017). Here, Defendant invites the Court to adjudicate the constitutionality of a crime which is not even charged. That would be a quintessential advisory opinion. The Court should decline to render one.

### D. Defendant Fails to Establish an Equal Protection Violation

In the event the Court reaches Defendant's equal protection claim, the claim should be rejected. Immigration laws are subject to a highly deferential standard of review. With the proper standard in view—requiring Defendant, for instance, to negate "every conceivable basis which might support" the illegal-entry law—Defendant's claims fail.

#### 1. Congress's Immigration Laws Are Subject to Deferential, Rational-Basis Review

For more than a century, "it has been universally recognized that Congress possesses authority over immigration policy as an incident of sovereignty." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998). The Supreme Court has called

---

[4] At best, Defendant may seek to weld the congressional decisions made in the Immigration Act of 1990 to the Act of 1929. That sort of attenuated constitutional inquiry—particularly where the actual charged crime was not present in the original bill—is not countenanced by any authority.

Congress's inherent immigration power "plenary"; the Ninth Circuit has deemed it "sweeping." *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) and *Catholic Social Servs. v. Reno*, 134 F.3d 921, 927 (9th Cir. 1998)). "Whatever the label, all agree that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Id.* (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976). Indeed, "the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Fiallo*, 430 U.S. at 796 (citing *Mathews v. Diaz*, 426 U.S. 67, 82 (1976); *see also id.* at 792 ("[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("deferential standard of review" applies in immigration context).

According to Supreme Court jurisprudence, this "deferential standard of review" is limited to considering whether the law is "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769. In *Mandel*, the Attorney General denied admission to a Belgian journalist who had been invited to speak at a conference at Stanford. 408 U.S., at 756-57. The professors who wished to hear Mandel challenged that decision under the First Amendment, and the Supreme Court acknowledged that their constitutional "right to receive information" was implicated. *Id.* at 764-65. But the Court limited its review to whether the Executive gave a "facially legitimate and bona fide" reason for its action. *Id.* at 769. Given the authority of the political branches over admission, the Court held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens. *Id.* at 770.

The Supreme Court later confirmed that *Mandel*'s deferential test applies equally to congressional decision-making. In *Fiallo*, decided in 1977, the Supreme Court considered

5

a congressional law giving immigration preferences to mothers of illegitimate children. 430 U.S. at 795. In other words, the state created a "categorical" entry classification that discriminated on the basis of sex and legitimacy. In reviewing an equal protection challenge alleging discrimination against fathers, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *Id.* at 795. In rejecting the constitutional challenge, the Court remarked that the issue was one "solely for the responsibility of the Congress and wholly outside the power of this Court to control." *Id.* at 799 (quotation omitted). The Court also made clear that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative decision." *Id.*; *see also Hawaii*, 138 S. Ct. at 2419 (citing *Fiallo*'s principle that the judiciary is not to probe the justifications underlying Congress's immigration decisions).

In the Ninth Circuit, *Mandel/Fiallo*'s "facially legitimate and bona fide" test is "equivalent to the rational basis test typically applied in equal protection cases." *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir. 1995) (applying rational-basis review and finding the Government "put forth facially bona fide and legitimate reasons" for requiring proof of paternity within a certain time limitation); *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) (stating that in immigration affairs, outside of citizenship claims, "[w]e have applied *Fiallo*'s standard and looked for only a 'facially legitimate and bona fide reason' to support a statutory distinction"); *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard . . . ."); *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc) (for equal protection claims, "ordinary rational basis review is the appropriate standard in the immigration context").[5]

---

[5] In a concurring opinion in *Ledezma-Cosino*, three judges presented their view, citing *Mandel/Fiallo*, that the government's burden in the immigration context is "even lighter than rational basis: We approve immigration laws that are facially legitimate without probing or testing possible justifications." *Ledezma-Cosino*, 857 F.3d at 1050 (Kozinski, J., concurring). And in *Hawaii*, the Supreme Court stated that "[a] conventional application of *Mandel*, asking only whether the policy is facially legitimate and bona fide, would put

Defendant makes a passing remark in a footnote that "Courts apply strict scrutiny to laws that are 'motivated by a racial purpose or object.'" ECF No. 57 at 7 n.7 (citing *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)). However, *Hunt* involved claims of racial gerrymandering, not immigration law, and has no bearing on the proper level of scrutiny here. *Contrast Hunt*, 526 U.S. at 1548-49 ("[o]ur decisions have established that all laws that classify citizens on the basis of race, . . . are constitutionally suspect and must be strictly scrutinized"), *with Fiallo*, 430 U.S. at 792 ("[I]n the exercise of its broad power over immigration and naturalization, Congress regularly makes rules that would be unacceptable if applied to citizens.") (quotation omitted).[6]

Based on arguments in other cases, the United States anticipates that the defense will argue that Section 1325 is not subject to rational-basis review because it is a criminal law, not an immigration law. That is a distinction without a difference. Indeed, the Ninth Circuit has explicitly found that Section 1326—a criminal law—is "well within the ambit of Congress's sweeping power over immigration matters." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) ("In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite."). And in *United States v. Ruiz-Chairez*, 493 F.3d 1089 (9th Cir. 2007), the Ninth Circuit applied rational basis review to the illegal reentry sentencing Guideline—a criminal sentencing provision—and found it passed that test. *See*

---

an end to our review." 138 S. Ct. at 2420. Nonetheless, at the Government's suggestion, the Court went further to apply rational basis review to the immigration policy at issue. In any event, regardless of the precise standard of review, it is no more than rational basis.

[6] In any event, given Congress' plenary authority over immigration, the illegal entry law would satisfy even strict scrutiny, i.e., legislation "narrowly tailored to achieve a compelling interest." *Miller v. Johnson*, 515 U.S. 900, 920 (1995). "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Cortez-Rocha*, 394 F.3d 1115, 1123 (9th Cir. 2005) (citing *United States v. Ramsey*, 431 U.S. 606, 616 (1977)); *see also United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("The Government's interest in preventing the entry of unwanted persons . . . is at its zenith at the international border."). Section 1325 achieves that interest in the most possible tailored way.

*id.* at 1091 ("Because the illegal reentry statute is a proper exercise of Congress's immigration power, and because § 2L1.2 properly implements this congressional directive, we must conclude that the 16 level enhancement in §2L1.2 serves a legitimate government interest and has a rational basis.") (citations omitted).

### 2.  The Rational-Basis Test is Satisfied

The rational-basis test is an "exceedingly low level of judicial scrutiny." *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000). The test is met where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). "[T]he government 'has no obligation to produce evidence to sustain the rationality of a statutory classification'; '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Glickman*, 217 F.3d at 1201 (quoting *Heller*, 509 U.S. at 320).

"The rational basis standard . . . does not require that the [governmental entity] choose the best means of advancing its goals." *Vermouth v. Corrothers*, 827 F.2d 599, 603 (9th Cir. 1987). Instead, all that is needed is some "rational connection" between the rule and the governmental interest, regardless of whether that rule is an "exact fit" for the interest at issue. *Mauro v. Arpaio*, 188 F.3d 1054, 1059–60 (9th Cir. 1999). Moreover, rational-basis review allows for decisions "based on rational speculation unsupported by evidence or empirical data." *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015).

The United States has a legitimate interest in deterring illegal entry. And, as discussed above, there is a clear rational relationship between that interest and Section 1325, which criminalizes illegal entry. *See, e.g., Hernandez-Guerrero, supra* ("without the threat of criminal prosecution that [Section 1325] provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite."). Defendant's own exhibits outline the goal of deterrence Congress had in mind with the illegal entry law:

> Under the present law all that can be done to [an alien who enters illegally] is to deport him. It is believed that if the class of aliens who are endeavoring to enter the United States surreptitiously become aware that when detected they will be fined and imprisoned, as well as deported, the number who attempt to

> smuggle themselves or have themselves smuggled into the United States will be materially lessened.

Defense Exhibit J, p. 7-8; *see also* H.R. Rep. No. 2418 at 7.

As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. "On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Id.* (*citing Dep't of Ag. v. Moreno*, 413 U.S. 528, 534 (1973)). That is clearly not the case here with Section 1325 – a law seeking to deter all aliens from illegally entering the country.

Defendant cites the higher percentage of illegal-entry prosecutions of Mexican and Latin American defendants as proof of disparate impact and discrimination. It is not. Those numbers are a product of geography, not discrimination. For instance, in FY19, Border Patrol had 859,501 total encounters. *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. Ninety-nine percent of these encounters (851,508) occurred on the southwest border. *See* https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.

These numbers are neither surprising nor illuminating of Congress's motives in the 1920s. Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity—to include those from a country sharing 1,954 miles of border with the United States—virtually any such law could be challenged on that ground. *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (plurality opinion) (finding disparate impact of DACA rescission on Latinos from Mexico—totaling 78% of DACA recipients—did not establish a plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal

protection grounds") (citation omitted);[7] *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.").

### 3. *Arlington Heights*

Defendant relies almost exclusively on the 1977 decision in *Arlington Heights*. But *Arlington Heights* is inapplicable here.[8] Indeed, Defendant fails to cite any case finding the rubric of *Arlington Heights* applicable to immigration laws passed by Congress. For good reason: the expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799. There is no probe more exacting than *Arlington Heights*, which invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267-68. This does not comport with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking.

Separately, Defendant cannot escape the reality that the "governing statutory framework" of United States' immigration law comes from 1952, when Congress replaced prior disparate statutes with the comprehensive INA. *See* Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1 et seq.); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018). Nor can he escape the fact that the crime he is charged with—attempted entry—was not even a crime until 1990. Or that 8 U.S.C. § 1325 has been updated or modified several additional times by Congress—including in 1986, 1991, and

---

[7] For this same reason, Defendant's attempt to show disparate impact under *Arlington Heights* fails. *See* ECF No. 57 at 21-24.

[8] *Arlington Heights* involved a rezoning request to accommodate the placement of low-income housing, "which would probably be racially integrated." *Id.* at 258. In other words, it is far from the circumstance here involving the plenary power of Congress over immigration affairs.

1996. Defendant's motion waves away this lengthy congressional record, claiming "later reenactments do not cleanse the law of its original taint." ECF No. 57 at 21.

Under Defendant's view, the taint of prior discriminatory intent forever prevents the criminalization of illegal entry. This makes little sense. Whether intentional discrimination existed in 1929 legislation—a point contested below—is a question about the motives of the 1929 legislature. Legislative intent is not an artifact that "carr [ies] over" from one law to the next; it must be decided anew with each successive enactment. *See Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality) (inquiring "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot . . . condemn governmental action that is not itself unlawful"); *cf. Palmer v. Thompson*, 403 U.S. 217, 225 (1971) (contemplating that a law invalidated because of improper motive might "be valid" if the legislature "repassed it for different reasons").

The cases Defendant relies on for his "forever tainted" argument do not support it. In *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), the Supreme Court held that the Sixth Amendment requires that a jury find a criminal defendant guilty by a unanimous verdict. That result flowed simply from a historical and textual analysis of the Sixth Amendment, e.g., that a "trial by an impartial jury" "unmistakabl[y]" required a jury to "reach a unanimous verdict in order to convict." *Id.* at 1395. The Court did not hold that the origins of the state laws at issue were the basis for invalidating those state laws. On the contrary, the majority, even while commenting on the racist origins, explicitly stated that "the dissent is right about one thing—a jurisdiction adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth Amendment." *Id.* at 1401 n.44; *see id.* at 1426 (Alito, J., dissenting) ("If Louisiana and Oregon originally adopted their laws allowing non-unanimous verdicts for these reasons, that is deplorable, but what does that have to do with the broad constitutional question before us? The answer is: nothing."). Defendant's characterization of *Ramos* is that the Court's discussion of the racial underpinnings of the state law drove the outcome. Instead, as the majority acknowledged, it was entirely

superfluous. In any event, *Ramos* does not apply here because it does not involve immigration law and the concomitant deferential standard of review.

  *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), is similarly irrelevant. There, the Supreme Court considered whether application of a "no-aid" provision in Montana's constitution to bar religious schools from participating in a state scholarship program violated the Free Exercise Clause of the First Amendment. *Id.* at 2254. The answer was yes, because the provision "plainly exclude[d] schools from government aid solely because of religious status." *Id.* at 2255. The provision was not found unconstitutional because of any "checkered tradition," as Defendant suggests. ECF No. 57 at 20. That phrase appears briefly in the opinion in response to the argument that a tradition arose in the late-19th century against state support for religious schools. *Espinoza*, 140 S. Ct. at 2258. The Court rejected that movement as illuminating the historical understanding of the Free Exercise Clause. *Id.* at 2259 ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause."). In other words, neither *Ramos* nor *Espinoza* stands for the proposition Defendant claims—that "not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint." ECF No. 57 at 21.

  As a final example of Defendant's erroneous taint argument, several courts have recognized that, when a State reenacts a voting provision that was intentionally discriminatory at its origin, the ultimate focus in subsequent litigation is the intent of the reenacting legislature, not the original one. *See Hayden v. Patterson*, 594 F.3d 150, 166-167 (2d Cir. 2010) (addressing felon-disenfranchisement law); *Johnson v. Governor*, 405 F.3d 1214, 1223-1224 (11th Cir.) (en banc) (same); *Cotton v. Fordice*, 157 F.3d 388, 391-392 & n.7 (5th Cir. 1998) (same); *Chen v. City of Houston*, 206 F.3d 502, 520-521 (5th Cir. 2000) (addressing racial-gerrymandering claim). Those courts also have rejected the proposition that prior intent "remains legally operative" unless and until some affirmative contrary showing is made. *Johnson*, 405 F.3d at 1223; *see Hayden*, 594 F.3d at 166-167;

*accord Cotton*, 157 F.3d at 392 (affirming that plaintiff was required to show that the "current version" of the law was "adopted out of a desire to discriminate").

In any event, even assuming Defendant's "forever tainted" position is permissible, and even assuming the Court may examine the constitutionality of legislation that does not contain the crime defendant is charged with, and even assuming *Arlington Heights* applies to probe the justifications of Congress's immigration actions, Defendant's claim still fails. To begin, Defendant fails to show a cognizable disparate impact. As outlined above, the statistics Defendant cites for disparate impact are a feature of Mexico's proximity to the United States – not discrimination. This, alone, is sufficient to reject Defendant's *Arlington Heights* analysis. *See, e.g.,* ECF No. 57 at 21 (Defendant admitting *Arlington* requires establishing a law "disparately impacts a particular group"); *Regents*, 140 S. Ct. at 1915-16 ("because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds").

Moreover, Defendant's perspective that the 1920s immigration laws, leading to the 1929 illegal entry law, were premised on racial animus towards Mexicans is considerably undercut by the fact that people born "in the republic of Mexico" were not subject to the quotas established by the Immigration Act of 1924. On the contrary, an immigrant born in "the Republic of Mexico" was defined as a non-quota immigrant on par with those born in Canada and several other places. *See* Pub. L. No. 68-139, § 4, 43 Stat. 155. For some—Asia, for instance—the quota system completely excluded immigration. *See* https://history.state.gov/milestones/1921-1936/immigration-act. These facts do not comport with Defendant's view that Congress was developing legislation with the intent and purpose of discriminating against persons from Mexico. Relatedly, "no [Supreme Court] case . . . has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Indeed, the Supreme Court, in *United States v. O'Brien*, 391 U.S. 367, 383 (1968),

cautioned of "the hazards of declaring a law unconstitutional because of the motivations of its sponsors. First, it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment," *Palmer*, 403 U.S. at 224 (citing *O'Brien*, 391 U.S. at 383, 384), "that is [otherwise], under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it," *O'Brien*, 391 U.S. at 384. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [courts] to eschew guesswork." *Id.*

At the conclusion of the *Arlington Heights* analysis, Defendant claims the United States would have to show that the contested law would have passed "even had the impermissible purpose not been considered." ECF No. 57 at 24 (citing *Arlington Heights*). There is no need to reach this point. And in any event, Congress *did* pass a new illegal entry law in 1952 (and a new attempted entry law in 1990), and Defendant does not suggest any discriminatory purpose with those pieces of legislation.

Finally, there is no need for an evidentiary hearing. Defendant's entire claim rests on *Arlington Heights*. But his claim fails for many reasons besides *Arlington Heights*. There is therefore no reason to hold an evidentiary hearing. *See, e.g., United States v. Irwin*, 612 F.2d 1182, 1187 (1980) (evidentiary hearing not required where the material provided to the court "show as a matter of law that [the defendant] was not entitled to relief").

## III.
## CONCLUSION

Defendant's motion to dismiss should be denied.

DATED: October 29, 2020                           Respectfully submitted,

                                                                          Robert S. Brewer, Jr.
                                                                          United States Attorney

                                                                          */s/ Jill S. Streja*
                                                                          JILL S. STREJA
                                                                          Assistant United States Attorney