**MARTHA M. HALL**
Attorney at Law
California State Bar No. 138012
964 Fifth Avenue, Suite 214
San Diego, California 92101
Telephone: (619) 544-1451
Facsimile: (619) 544-1473
E-mail: Martha_DiIorioHall@yahoo.com

Attorney for Defendant **Gallegos-aparicio**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

**(HON. GONZALO P. CURIEL)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> **MARCOS GALLEGOS-APARICIO,** ) <br> ) <br> Defendant. ) <br> ) | Criminal No. **19-CR-02637-GPC** <br><br> Date: November 12, 2020 <br> Time: 2:30 P.M. <br><br> **REPLY TO THE GOVERNMENT'S RESPONSE AND OPPOSITION** |

**I.**

**THE GOVERNMENT HAS FAILED TO REBUT THE EVIDENCE OF DISCRIMINATORY INTENT**

In its response to Mr. Gallegos-Aparicio's motion to dismiss the superseding indictment, the government never disputes that discrimination was a "motivating factor" in Congress's criminalization of illegal entry. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Nor does it show that Congress would have passed the Undesirable Aliens Act of 1929 "even had the impermissible purpose not been considered." *Id.* at 270 n.21. Indeed, the government makes no attempt to condemn or even acknowledge the voluminous record of racist statements by legislative and executive officials underlying the illegal entry law—just a few of which were that Congress wished to keep the "rat men" out of the American

gene pool;[1] "protect[] [the] American racial stock from further degradation or change through mongrelization";[2] avoid "poisoning the American citizen";[3] and keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico."[4]

Instead of grappling with this troubling history, the government claims that any racial intent motivating the criminalization of illegal entry is irrelevant, positing three basic arguments. Because none of these arguments is persuasive, the Court should find that § 1325 violates equal protection under *Arlington Heights*, or at least hold an evidentiary hearing to determine whether Congress would have passed the 1929 law without this discriminatory intent.

### 1)   Six Supreme Court Justices have rejected the government's argument that Congress's intent "must be decided anew with each successive enactment."

In his motion, Mr. Gallegos-Aparicio pointed out that two recent Supreme Court decisions held that reenacting a law passed with a discriminatory purpose does not cleanse the law of this purpose. First, the majority in *Ramos v. Louisiana* rejected Justice Alito's dissent arguing that recodification of a jury non-unanimity rule cleansed it of its racist intent, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." 140 S. Ct. 1390, 1401 n.44 (2020). Then in *Espinoza v. Montana Dep't of Revenue,* the majority relied on the law's "checkered tradition" of underlying religious discrimination to overturn it, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." 140 S. Ct. 2246, 2259 (2020). *Id.* at 2259. Concurring, Justice Alito noted that because "I lost, and *Ramos* is now precedent,"

---

[1] Hans P. Vought, *The Bully Pulpit*, 174–75 (2004) (statement of Secretary of Labor James Davis).
[2] Exhibit E, Cong. Rec. at 121–22 (statement of Representative Box).
[3] Exhibit C at 104 (statement of Representative Fitzgerald).
[4] Exhibit G, 69 Cong. 69 at 155 (statement by constituent with which Representative Box and Commissioner General of Immigration agreed).

2

the Court could examine the law's underlying motives even where legislators had "readopted their rules under different circumstances in later years." *Id*. at 2268 (quotations omitted).

The government brushes off these statements as dicta, claiming that Congress's intent "must be decided anew with each successive enactment." Resp. 11–13. To begin, these statements in *Ramos* and *Espinoza* are not dicta. In the words of Justice Alito, who originally believed that discriminatory intent did *not* survive a law's reenactment, that approach is "now precedent." *Espinoza*, 140 S. Ct. at 2259.

But even if these statements *were* dicta, "lower courts are advised to follow the Supreme Court's considered dicta." *Sonner v. Premier Nutrition Corp.,* 962 F.3d 1072, 1079 n.5 (9th Cir. 2020). In fact, courts must accord it "great weight," *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 683 (9th Cir. 2004), as a "prophecy of what the Court might hold," *Nettles v. Grounds*, 830 F.3d 922, 931 (9th Cir. 2016) (en banc). Here, six Justices either voiced support for considering a law's discriminatory origins following reenactment or recognized that position as the prevailing one. *See Ramos*, 140 S. Ct. at 1392–1420; *Espinoza*, 140 S. Ct. at 2268. On the scale of prophetic dicta, this endorsement during the Court's most recent term rates exceptionally high.

This approach also makes sense. Perhaps if Congress had returned to the proverbial drawing board, grappled with the law's racist origins and effects, and decided it was nonetheless good policy, the government would have a point. But the government offers no reasoned justification why *any* amendment or reenactment—no matter how technical or stylistic—would neutralize all prior legislative history. To the contrary, "[u]nder established canons of statutory construction, it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." *Redmond-Issaquah R.R. Pres. Ass'n v.*

*Surface Transp. Bd.*, 223 F.3d 1057, 1062 (9th Cir. 2000) (quotations omitted). The government has neither argued nor shown that the 1990's Congress rejected the initial prejudice behind the illegal entry statute. In fact, examination of the legislative history and social and political culture wars shows the opposite: the reenactments were based on ongoing discriminatory intent and bias against migrants from south of the border and migrants of color.  Absent any evidence that somehow these discriminatory purposes were purged, the 1929 law's reenactment with only minor, stylistic changes to the offense definition strongly suggests that the law's purposes and effects endured. "Quite obviously, reenacting precisely the same language would be a strange way to make a change." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 484 (1997).

### 2) Subsequent Re-enactments Reflect Continuing Anti-Latinx Prejudice And Ongoing Discrimination

The subsequent re-enactments of the statutes criminalizing illegal entry and re-entry, which occurred in the 1950's and 1990's, did not "cleanse" the discriminatory intent of the original law.  In fact, the re-enactments in the 1990's were motivated by the same racial animus against Latinx persons and migrants from Mexico and Central America, who are also people of color.

The landscape of legal and illegal immigration was dramatically impacted by the end of the Bracero program in 1964.  The Bracero Program legalized the entry of migrant, seasonal farm workers.  With the termination of the program, no legal means of circular migration existed and immigrant workers were forced to enter without authorization to continue working for the U.S. employers eager to hire them.  Thus, it was a shift in U.S. policies, rather than the behavior of the immigrants, that resulted in an increase of undocumented migrants. [5]

---

[5] Douglas S. Massey and Karen A. Pren, *Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin America*, National Institutes of Health, Popul Dev Rev.

At the same time the Bracero Program ended (and possibly due to the same underlying discrimination), anti-immigrant sentiment and rhetoric was on the rise. Far from happenstance, the systemic process of racialization of Latinx individuals was the result of a "dedicated campaign of psychological framing and social boundary construction intended to position them as a stigmatized out-group in American social cognition."[6] For example, stoked by anti-Latinx-immigrant sentiment, English-only campaigns in California and nationwide experienced a resurgence in popularity. In California specifically, where most immigrants chose to settle, white citizens started to view an "illegal alien invasion from Mexico" as a major problem.[7] In response, in 1983, California Senator S .I. Hayakawa formed an organization called "U.S. English" calling for English to be the official language of the whole country.[8] Within four years of the organization's founding, forty-eight of fifty states were considering proposals designating English as the official language.[9] In 1986, California voters approved Proposition 63, which declared English as California's official language. *Id*. at 129. Nationwide, Congress has considered freestanding Official English and English-Only legislation since 1981, with the House passing an English language bill

---

2012.

[6] Douglas S. Massey, *The New Latino Underclass*: *Immigration Enforcement as a Race-Making Solution,* Stanford Center on Poverty and Inequality, at 1-2, 5, available at https://inequality.stanford.edu/sites/default/files/media/_media/working_papers/massey_new-latino-underclass.pdf .

[7] Ruben Garcia, *Critical Race Theory and Proposition 187: The Racial Politics of Immigration Law*, Univ. of Calif. Los Angeles, Chicana/o Latina/o L. Rev, 119 (1995) available at https://escholarship.org/uc/item/6r73r894.

[8] Victoria-Maria MacDonald, *Demanding their Rights: The Latino Struggle for Educational Access and Equity*, American Latinos and the Making of the United States: A Theme Study, 307, 320, available at https://www.nps.gov/heritageinitiatives/latino/latinothemestudy/education.htm.

[9] Immigration to the United States, *English-only and official English Movements*, 2015, available at https://immigrationtounitedstates.org/481-english-only-and-official-english-movements.html.

in 1996 (the same year it reenacted and amended §§ 1325 and 1326).[10]

At the end of the 1980's, the American economy suffered a serious downturn and brown-skinned migrants became the preferred scapegoat for all that ailed the country.[11] President Ronald Regan labeled undocumented migration as a "threat to national security,"[12] and in 1986, Congress passed and Regan signed the Immigration Reform and Control Act (IRCA), which toughened immigration laws, increased border security, and imposed requirements on employers to monitor immigration status of employees, while simultaneously granting amnesty to undocumented immigrants currently present in the nation.[13]

This one-time grant of amnesty later became a rallying cry for anti-Latinx and anti-immigrant zenophobia.  It is notable that there has not been a law passed since IRCA that grants any increase in the paths to legal residence or citizenship.  Instead, politicians quickly realized (and took advantage of) the political points scored by demonizing Latinx immigrants and continued to stoke white fear around illegal immigration.[14] Politicians also used anti-immigrant language to "mobilize white voters who feel that immigrants are 'taking jobs from them'."[15]  In 1991, governor

---

[10] Steven W. Bender, *Old Hate in New Bottles: Privatizing, Localizing, and Bundling Anti-Spanish and Anti-Immigrant Sentiment in the 21st Century*, 7 Nev. L. J. 883. 888 (2007), available at https://digitalcommons.law.seattleu.edu/faculty/625.

[11] Donald Kerwin, *From IIRIRA to Trump: Connecting the Dots to the Current US Immigration Policy Crisis*, Journal on Migration and Human Security, Sage Journals, 2018, available at https://doi.org/10.1177/2331502418786718.

[12] Douglas S. Massey, *The New Latino Underclass*: *Immigration Enforcement as a Race-Making Solution,* Stanford Center on Poverty and Inequality, 1, 9, available at https://inequality.stanford.edu/sites/default/files/media/_media/working_papers/massey_new-latino-underclass.pdf .

[13] Douglas S. Massey, *The New Latino Underclass*: *Immigration Enforcement as a Race-Making Solution,* Stanford Center on Poverty and Inequality, 1, 12, available at https://inequality.stanford.edu/sites/default/files/media/_media/working_papers/massey_new-latino-underclass.pdf .

[14] Massey and Pren at 5.

[15] Garcia at 120.

Pete Wilson was sworn in as governor. With Californians eager for a scapegoat for their economic woes in the recession plaguing them, Wilson and the California Republican Party delivered, capitalizing on the anti-immigrant sentiment and accusing immigrants of draining state resources, increasing crime, and taking jobs from deserving (white) Californians.[16]

Elected officials continued stoking fears about undocumented immigrants, and in 1993 alone, the California legislature introduced 21 separate pieces of legislation attempting to take away rights from the undocumented population.[17] That same year, a group of "concerned California residents" were "fed up" and tired of "aliens" "crowding their children out of public schools, crowding welfare offices, and crowding the emergency rooms of hospitals." *Id*. The group became the "Save Our State" Movement. *Id*.

Anti-immigrant sentiment had reached a peak. Wilson made undocumented immigration "the cornerstone of his 1994 re-election campaign" and "supported much of the anti-immigrant legislation in the legislature, and sued the federal government for reimbursement of state funds spent on undocumented immigrants." *Id.* And so, Proposition 187 was born, a piece of legislation expressly written to prevent undocumented immigrants from seeking a swath of public benefits, including public education for their children (expressly prohibited by the Supreme Court in *Plyler v. Doe*, 459 U.S. 202 (1982), but it was widely hoped this legislation could push the Court to address the issue again).[18] One drafter of Proposition 187, Barbara Coe, proclaimed:

---

[16] Latino Community Foundation, *Latino Political Power in California: 25 Years after Proposition 187*, 2019, available at chrome-extension://oemmndcbldboiebfnladdacbdfmadadm/https://latinocf.org/wp-content/uploads/2019/03/LCF-Prop-187-Paper.pdf.
[17] Garcia at 130.
[18] Garcia at 131.

7

> [T]he militant arm of the pro-illegal activists...have vowed to take over first California, then the Western states and then the rest of the nation....You get illegal alien children, Third World children, out of our schools, and you will reduce the violence. That is a fact...You're not dealing with a lot of shiny face, little kiddies, you're dealing with Third World cultures who come in, they shoot, they beat, they stab and spread their drugs around the school system. And we're paying them to do it.[19]

Coe also equated undocumented immigrants with criminals, stating, without evidence, "[v]iolent crime is rampant. Illegal alien gangs roam our streets, dealing drugs and searching for innocent victims to rob, rape, and in many cases, murder those who dare violate their 'turf'...[N]early 90% of illicit drugs are brought here by illegals..." *Id*. Even worse, during the 187 campaign, Barbara Kiley, a mayor of a city in Southern California, described the children of undocumented immigrants as "**those little fuckers**," and her husband opined that protestors of 187 damaged their own case because "[o]n TV there was nothing but Mexican flags and brown faces." *Id*. at 1872. Harold Ezell, the Western Regional Commissioner of the INS during Regan's administration in the 1980s said "**illegal aliens...should be caught, skinned, and fried**." *Id.* This is the history and political climate leading up to the 1990's re-enactments of the laws against illegal entry.[20] Such a history can hardly be said to purge the initial discrimination that motivated the 1929 Act. Indeed, this rhetoric is evidence of the continuation of the same discriminatory motive.

In response to Pete Wilson's lawsuit against the Federal Government and the wave of anti-brown-skin sentiment, Congress passed a serious of measures that "re-

---

[19] Kevin R. Johnson, *Proposition 187 and its Political Aftermath: Lessons for the U.S. Immigration Politics After Trump*, U.C. Davis L. Rev. 53: 1859, 1870, 2020.

[20] California continued with its anti-immigrant legislation and adopted Proposition 209 in 1996, eliminating affirmative action and Prop 227 in 1998 ended bilingual education programs in public schools, of course directly impacting the Spanish-speaking population.

enacted" the initial criminalization of illegal entry, toughened the penalties and restricted the processes available to migrants: (1) AEDPA, which included a series of tough immigration measures; (2) Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) which together with AEDPA restricted judicial review of immigration decisions made by the Executive Branch and expanded the definition of "aggravated felony" in the immigration code to include crimes that were neither aggravated, nor felonies in many cases; and (3) The Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), colloquially known as welfare reform, which eliminated access to public benefits for undocumented and documented immigrants.[21] These laws codified the "abandon[ment] of the objective of assimilation, assumed the indigestibility of recent immigrants and refugees, and focused increasingly upon managing inassimilable and therefore presumptively unknowable, unruly, and dangerous immigrants." [22] Truly, such words echo the sentiments expressed in the 1920's eugenics movement.

The legislative history confirms that discrimination and anti-Latinx biases continue to form the purpose and basis for the criminalization of "illegal entry" under §§ 1325 and 1326. For example, after hearing that 10% of felony arrests in New York each year since 1986 involved "aliens," Rep. Smith of Texas falsely posited, "Given the fact that illegal aliens coming across the border seem to be prone to more drug-related types of crime, what does that say, in your judgment, about the need to give arrest authority to INS agents?" 1989 101 Cong. HR 3333, pp. 25 & 36. He went on to say, without any factual support, "Ninety-five percent of the people arrested for drug smuggling in Santa Ana, CA, were illegal aliens." *Id.* at 48.

---

[21] *Id.* at 1876.
[22] Teresa A. Miller, *Citizenship and Severity: Recent Immigration Reforms and the New Penology*, 17 Geo. Immigr. L. J. 611, 2003, available at https://digitalcommons.law.buffalo.edu/journal_articles/408.

9

Another example of this continued prejudice against Latinx immigrants is the recurring preference for English-speaking immigrants (who tend to be white).  See, 1989 135 Cong Rec S7748-02, p. 3 (emphasis added).  In addition, in 1989 Rep. Shelby suggested that undocumented immigrants should not be included in census figures.  1989 135 Cong Rec S15673-01, p. 14.

The Immigration Act of 1990 radically changed and expanded the grounds for exclusion and deportation enumerated in the INA, now to include crimes involving "moral turpitude," controlled substances offenses, "aggravated felonies," excluding/deporting drug users and addicts, excluding/deporting undocumented people with firearms, and those migrants that have "become a public charge" within the last five years, reflecting the negative caricatures of Latinx peoples and the fiction that hordes of "criminal aliens" were threatening the border.[23]  Rep Simpson lauded the increased strictures on deportation procedures, peddling yet another anti-immigrant fiction that "deportees had more due process than did an American citizen." 136 Cong. Rec. S17106-01, 136 Cong. Rec. S17106-01, S17109, 1990 WL 165401 (p. 9 of pdf); but see *Lopez-Mendoza*.  Rep. Graham also praised the huge expansion of deportable offenses and aggravated felonies, stating, "Finally, the Federal Government must make sure that dangerous aliens are not on the streets, not allowed to commit new crimes, and not caught in a lengthy deportation process." 136 Cong. Rec. S17106-01, 136 Cong. Rec. S17106-01, S17117-18, 1990 WL 165401 pp. 27-28.

Perhaps most revelatory is the disparate treatment of seasonal, manual labor and low wage workers when compared to the so-called "skilled and extraordinary"

---

[23] In response to the trope that hordes of criminal aliens crossing illegally, the 1990 Act authorized an increase of 1,000 Border Patrol Agents, expanded criminal penalties for marriage fraud and concealment of "aliens," and added a criminal penalty for "immigration-related entrepreneurship fraud."  1990 U.S.C.C.A.N 6784, 0/1990 HR Conf. Rep. 101-955.

immigrants. The Immigration Act of 1990 added a preference system for "skilled" and "extraordinary ability" immigrants defined as those immigrants performing "skilled labor (requiring at least 2 years training or experience), ***not of temporary or seasonal nature, for which qualified workers are not available in the United States.***" 1990 HR Conf Rep 101-955, p. 9 of pdf. (emphasis added); see also, Sec. 121. Employment Based Immigrants in (3)(A)(I). Rep. McCollum, praising this provision and the bill as a whole, noted: "the really good things, center on two or three areas. One of them is we now have a provision under this new law that will provide for a whole lot of new seed immigrants, people who do not have those family connections." 136 Cong. Rec. H12358-03, 136 Cong. Rec. H12358-03, H12362, 1990 WL 164526.

Rep McCollum's reference to these "skilled" immigrants as "seed immigrants" is based on the trope of the "good" and "bad" "seeds" of immigrants. Those granted amnesty under IRCA were considered "bad" seeds because they brought their families and their unskilled work; whereas under the 1990 Act, "good" seeds -- the "skilled" and wealthy immigrants – were preferred. Carve outs were made for these "exceptional" immigrants, including immigrants with "extraordinary ability" in the arts and athletics, as well as extraordinary achievement in the motion picture and television history. (Melania Trump immigrated as an exceptional worker because fashion models were considered a "specialty occupation.") 101(a)(15)(H)(i)(b) of Immigration and Nationality Act. 102 Cong HR 3048 p. 12. Notably, letters and statements in support of these carves outs were submitted from the Deputy Assistant Secretary from the Bureau of European and Canadian Affairs, the NHL, Ringling Bros Circus, and other Euro-centric organizations.[24]

---

[24] This Act also established a preference system for up to 10,000 wealthy immigrants every year, deeming them "employment creat[ors]" who have at least $1,000,000 of capital to theoretically start businesses in the United States. 1990 HR Conf Rep 101-955; *see* (5)(C), pp. 9-10. Prior to its passage in 1989, Rep. Bereuter of Nebraska read into the record an

11

At one point, a requirement of a national I.D. card was proposed but ultimately rejected as racist. The support for this provision and the fact it made it to the floor demonstrates, once again, the discriminatory purpose which continues to serve as the impetus for reenactments of §§ 1325 and 1326.  Rep. Edwards of California, recognizing that I.D. card laws tend to come along with immigration bills, said:

> An I.D. card is something that is very repugnant to a free society, and especially since the history of I.D. cards is so well known to most of the people of this world. One might ask who would be asked to show the I.D. card as someone walks down the street in an American city or an American town. It would not necessarily at all be someone who looks Anglo or white or somebody; it is always going to be someone who looks a little different from the rest of us.
>
> So there is going to be nothing but a lot of discrimination in an I.D. card.

136 Cong. Rec. H12980-02, 136 Cong. Rec. H12980-02, H12983-84, 1990 WL 290351.

Rep. Torres, also from California, echoed these sentiments:

> Ironically, the government of South Africa, after years of struggle, just abolished identifier pass books that were used to discriminate against its black citizens. Ironically, at the same time, the United States considers taking the idea up.
>
> I note that the proposed pilot project is to be tested in three States. What

---

article from Business Week that asks if American permanent residency was for sale. 1989 135 Cong Rec H7911-02, p. 2; see also, 136 Cong. Rec. H12358-03, 136 Cong. Rec. H12358-03, H12361, 1990 WL 164526.  Rep. Campbell, of California, put it more bluntly, stating, "It remains inescapable that America would, for the first time in its history, be granting a statutory preference for citizenship based on wealth." 136 Cong. Rec. H12358-03, 136 Cong. Rec. H12358-03, H12362, 1990 WL 164526, p. 11-12.

12

> States? California, Texas? Presumably, one of those States could be the State of Virginia. Let me read to you a statute passed in Virginia in 1680, as part of the first major slave codes:
>
> "No Negro or slave may go from his owner's plantation without a certificate and then only on necessary occasions; the punishment: twenty lashes on the bare back, well laid on."
>
> Mr. Speaker, we fought a civil war to rid this country of just such laws.
>
> I rise today, in part, to inform my colleagues that there are a significant number of Members of this body who will not countenance even the hint of adopting legislation that will take us down that road again.
>
> When I was privileged to serve as this Nation's Ambassador to Unesco in Paris, my children were required to have on their person, at all times, an identification card issued by the Government of France.
>
> My young son, with his long curly hair and olive skin, looked more like someone from Algeria or a Middle Eastern country than an American. He was constantly stopped by the police and questioned.
>
> One day he left our house without his I.D. card and was picked up by the police and thrown in jail. When I went down to the station to secure his release, I vowed to myself and to my children, that if I had it in my power, I would never let such a system take foothold in the United States. My colleagues, I stand before you in fullfillment of that pledge.

136 Cong. Rec. H12980-02, 136 Cong. Rec. H12980-02, H12984-85, 1990 WL 290351 (p. 13 of pdf).

As outlined above, in California and nationwide, anti-immigrant sentiment continued to build and reached its peak in the mid-1990s. The legislative history

13

around the 1996 re-enactment of 1325 reflected this culture war, based on the false narrative equating immigrants from south of the border with criminals and drug offenders.[25] This narrative is evidence in the fact that the 1996 Act increased criminal penalties for alien smuggling (adding at least 3 offense levels over the previous guidelines)(Sec. 203), fraudulent use of government-issued documents (Sec. 211), criminal penalties for false claims of US citizenship (Sec.215), criminal penalty for "illegal aliens" to vote in federal elections (Sec. 216), allowed the arrest and detention pending a decision on removal (Sec. 303), amended the definition of aggravated felonies (Sec. 321), increased penalties for illegal re-entry (Sec. 324), created a criminal alien identification system (Sec. 326), required proof of vaccination for immigrants (Sec. 341), added domestic violence and stalking as grounds for deportation (Sec. 350), allowed for states to conduct pilot programs to deny drivers licenses to undocumented people (Sec. 502), required proof of citizenship for Federal public benefits including welfare and student aid (Sec. 503-509), and expanded the "public charge" exclusion ground. (Sec. 551). H.R. Conf. Rep. 104-863, 1996. Rep. Smith of Texas supported this provision in particular, saying: "Just as we have asked deadbeat dads to support the children they bring into the world, this bill requires deadbeat sponsors to support the immigrants they bring into this country." 142 Cong. Rec. H12051-01 (1996) p. 22.

    The re-enactments of the §1325 in the 1990's were motivated by the same racial animus that motivated the 1929 Act. Far from relieving the government of the burden of addressing the original discriminatory intent, the re-enactments require the government to find a non-discriminatory basis for this re-enactment as well as the original passage.

---

[25] As the 1990 Act before it, the 1996 Act including substantial increases for Border Patrol, "with 1,000 new Border Patrol agents, 300 more than the President requested." 142 Cong. Rec. H12051-01 (1996), see also, Section 204. H.R. Conf. Rep. 104-863, 1996.

### 3) Section 1325 "bears more heavily" on Mexican and Latinx people, which is all that is needed to show disparate impact.

Finally, the government denies that illegal entry has disparately impacted Mexican and Latinx defendants. The government does not challenge Mr. Gallegos-Aparicio's statistics showing that such defendants have made up the overwhelming majority of people convicted of § 1325. *See* Dkt. No. 70 at 18–19, 21–23. Instead, it argues that this disparate impact is "a product of geography, not discrimination" due to Mexico's proximity to the United States.

However, an indication that the disparate impact on people-of-color is intentional rather than a geographic accident can be found in the recent "zero tolerance" program. The Attorney General's "zero tolerance" program explicitly targeted migrants along the Southern Border of the United States with Mexico.[26] This district saw the implementation of Zero Tolerance in May and June, 2018. Courtrooms filled with defendants-of-color became processing centers for the criminalization and summary expulsion of migrants seeking refuge in the United States. Mr. Gallegos-Aparicio was one of those brown-skinned defendants prosecuted under the Zero Tolerance program.

In addition, the government's "accidental geography" argument conflates the *reasons* behind a law with the law's *results*. The government does not dispute that § 1325's impact "'bears more heavily on one race than another.'" *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Under *Arlington Heights*, this is all that is required, since a law violates equal protection if its "original enactment was motivated by a desire to discriminate" and it "continues to this day to have that effect." *Hunter*, 471 U.S. at 233.

---

[26] In the Congressional Research Service's review of the Trump Administartions "Zero Tolerance Policy," it begins by noting that Central Americans seeking asylum were targets of the policy.

15

In *Hunter*, for instance, the law's challengers showed that Alabama's provision originally "disfranchised approximately ten times as many blacks as whites." *Id.* at 227. The challengers also showed that "[t]his disparate effect persists today" because "blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement." *Id*. This was all that was necessary to show disparate impact. *See id.* at 227–33. The law's challengers did not have to show that white and black people committed the relevant disenfranchising misdemeanors at similar rates or disprove any other reason that the law disproportionately disenfranchised black people.

Here, Mr. Gallegos-Aparicio easily clears this minimal disparate impact threshold.  As his motion showed, in the years following the 1929 law's passage, Mexicans comprised no fewer than 84% of those convicted and often made up as many as 99% of the defendants.[27]  That outsize impact continues today: between 2000 and 2010, Mexicans constituted between 87% and 97% of persons apprehended at the border.[28]  So it is irrelevant whether § 1325's present disparate impact is a product of "geography" or "discrimination."  All that matters is that it *does* impact Mexican and Latinx communities.

The government's characterization of the DACA decision in *Regents* is further evidence of its confusion. There, the plurality held that disparate impact on Latinx recipients is *alone* not enough to make up an entire *Arlington Heights* claim, as there was "nothing irregular about the history leading up" to DACA's rescission, and public officials' statements there were "unilluminating" on the question of discriminatory purpose. *Regents,* 140 S. Ct. at 1915–16. This simply reiterates the holding of *Arlington Heights* that "official action will not be held unconstitutional

---

[27] Kelly Lytle Hernandez, *Migra!: A History of the U.S. Border Patrol,* at 138-39 (2010) (citing U.S. Bureau of Prisons, *Federal Offenders,* Fiscal Years, 1931-36).

[28] *Border Patrol total Apprehensions by Mexico and Other Than Mexico, 2000-2019.*

16

solely because it results in a racially disproportionate impact." 429 U.S. at 264–65 (citing *Washington v. Davis,* 426 U.S. 229 (1976)). But it does not undermine the basic premise of *Hunter*: that disparate impact is evaluated by whether a law continues to have the racist effect its *original* enactors intended—not whether its current disparate impact is motivated by a *current* desire to discriminate. *See Hunter*, 471 U.S. at 233.

Furthermore, almost every claim of disparate impact under *Arlington Heights* could be characterized as a "product of geography." For instance, the Ninth Circuit has held that planning decisions made with a racist purpose in predominantly or trending Latinx neighborhoods have disparate impacts on Latinx people. *See The Comm. Concerning Commun. Improvement v. City of Modesto*, 583 F.3d 690, 704–06 (9th Cir. 2009). Educational decisions made with a racist purpose in a predominantly Latinx city have a disparate impact on Latinx students. *See Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015). Voting decisions made with a racist purpose in a state where some American Indian, Latinx, and Black neighborhoods have limited transit and mail access have a disparate impact on those communities. *See D.N.C. v. Hobbs*, 948 F.3d 989, 1004–06 (9th Cir. 2020) (en banc). If the government's "geography not discrimination" theory were correct, these plaintiffs could never have shown a disparate impact, yet the Ninth Circuit held in all these cases that they could.

Finally, the government makes a single attempt to argue that the 1929 illegal entry law was not motivated by racial discrimination, pointing to the fact that "people born 'in the republic of Mexico' were not subject to the quotas established by the Immigration Act of 1924." This is an odd way to engage with the voluminous evidence in Mr. Gallegos-Aparicio's motion. That evidence shows that the only thing keeping Congress from setting a quota on Mexicans throughout the 1920s was pressure from agricultural growers, not a lack of racism. *See, e.g.*, Dkt. No. 70,

17

Exhibit A, Hernández declaration, at 3 (stating that pressure from agri-businesses forced nativists in Congress to "choose between accepting a Mexican quota exemption or passing no immigration law at all"); Dkt. No. 70, Exhibit C, Representative Box (TX), "Deportation of Aliens." *Congressional Record*, (Feb. 16, 1929) p. H3619 (legislator complaining that there was no chance of a Mexican quota because too many growers were "interested in the importation of these poor peons").

The absence of quotas for Mexicans in 1924 was *in spite of* the legislators' discriminatory intent, not due to a lack of it. Indeed, the crime of illegal entry was brokered as a compromise between agricultural growers and nativists in Congress, allowing Congress's racial goals to be fulfilled while avoiding economic harm to growers. And at a minimum, if the government wishes to mount a meaningful claim that § 1325 was *not* fueled by a discriminatory purpose, the place to do so is in an evidentiary hearing.

//

//

//

//

//

//

//

//

//

//

//

## II.

## CONCLUSION

The government explains that it can be "extremely difficult" to figure out if Congress had a discriminatory motive when passing a facially neutral law. Resp. 15. But it is hard to imagine a legislative record *more* laden with evidence of racism, and a crime with a *greater* impact on one racial group, than illegal entry. And because the government comes nowhere close to showing that Congress would have enacted illegal entry in 1929 in the absence of a discriminatory motive, as Arlington Heights requires, this Court should dismiss the superseding indictment or, at a minimum, schedule an evidentiary hearing. For the foregoing reasons, it is respectfully requested that the Court grant the above motions.

Respectfully submitted,

S/Martha M. Hall

Dated: November 5 2020

**MARTHA M. HALL**

Attorney at Law

Attorney for **Gallegos-Aparicio**